Transportation Authority. Date number 21-1721. National Railroad Passenger Corporation doing business with Amtrak versus Southeastern Pennsylvania Transportation Authority. Mr. Bielsk for the appellants. Mr. Morota for the appellants. Good morning. Counsel for... Eric Bielsk, Your Honor. Counsel for Southeastern Pennsylvania Transportation Authority. Yes, thank you. Please proceed. Thank you, Your Honor. May it please the Court. In 1982, SEPTA and Conrail did everything required by the Northeast Act to convey the commuter easement to SEPTA so SEPTA could resume Conrail's commuter operations in Philadelphia. SEPTA reported the commuter easement in 1983 and has used it ever since for its operations. After more than 35 years without challenge, Amtrak filed this suit claiming that it owns the commuter easement and that its projected offer of a contract tender on a contract option in 1982 prevented Conrail and SEPTA from completing the Northeast Act transaction. The District Court agreed. The District Court erred because granting Amtrak's claim is contrary to the Northeast Act, is contrary to the terms of the option itself, is contrary to real estate law, and is barred by the statute of limitations. Let me ask you just a question to help clarify my thinking. The option that Amtrak is referring to, as I understand it, is the option that was created in 1976. That was part of the, what was called Exhibit A, Computer Passenger Service Agreement, and that was part of the Northeast Corridor Computer Operating Agreement of 1976. Is that correct? Almost, Your Honor. It was created as part of the commuter easement in 1976. It was actually originally attached to the deeds that conveyed the Northeast Corridor from Conrail to Amtrak as a reserved right on behalf of Conrail. The document you're referring to, which we have included in the joint appendix, is a reproduction of that. So is your answer yes or no? My answer is that is the commuter easement. That's a reproduction of the commuter easement. The answer is yes, that the option Amtrak is invoking is the language that appears in the 1976 agreement. Is that correct? Yes. All right. Then, as I understand the chronology here is a number of things happened, but the salient thing, and this is why I'm questioning you, is that as time passed, Conrail did not work out as Congress had contemplated it would. So Congress took further action, namely in the 1981 Act, where it created another scheme, and specifically your client is invoking Section 506B of the 1981 Act, which appears at your addendum to the opening brief at page 76. Is that correct? Yes, Your Honor. So, why given that Congress changed the scheme once Conrail failed, why is the 1976 option relevant now, or relevant after the 1981 Act? Our position is that it isn't relevant, that the effect of the 1981 statute was to make the option ineffective, at least certainly at that time, and could not be used to prevent Conrail from conveying the commuter easement to Amtrak. That's your biggest argument in this case, is Section 506, isn't it? Yes, Your Honor. Well, the thing that, you know, we're all textualists now, and that language says a commuter authority may initiate negotiations. Now, why do you take that to be an overriding of all, everything that came before, and granting a right to accept a, I don't get it, it may initiate negotiations. That, you want that commuter easement free. But why, I don't understand, it may initiate negotiations. Sounds like you can initiate negotiations, but if there's disagreement, of course, there's a procedure whereby the government agency decides. But where does it say you get it free? Well, there was a transfer agreement that included consideration, and the bigger context here, which is... Wait a minute, which transfer agreement? There was a September 1, 1982 transfer agreement between Conrail and SEPTA that specified all the properties of rights that were being transferred and conveyed from Conrail to SEPTA to enable SEPTA to take over. But this deals with the question of Amtrak's rights, right? And why do you take the position that may initiate negotiations gives you a right against Amtrak, that eliminates the option? Because once negotiations were initiated, the Act then specifies that the party shall specify the real properties to convey and can... Wait a minute, where's the shall? I do see the word shall in other parts of Section 506, but I don't see it in B1. I see it in C, I see it in E, but I don't see the word shall. In B2, 1, B2, any transfer agreement between such commuter authority and Conrail, and I'm looking at page 76... Any agreement shall specify. Right. But it doesn't say that there has to... It just says you may initiate negotiations. That's all it says. It's just words. It doesn't sound like you have a legal right. Why do you have to negotiate if you have a legal right? The scheme that Congress put in place here is that the parties would negotiate and reach an agreement on what was to be transferred, which real properties were to be transferred. And once that agreement was reached, that transaction had to close by the end of that year, December 31, 1982. When the agreement was reached, if it was reached, if it was reached. Correct. So that doesn't... I don't understand why that gives you a legal right. To get it free. Well, it isn't a question of free because there was a transfer agreement that included consideration, and it was part of the overall transfer of Conrail's authority to SEPTA as provided in the Northeast Act. And the point here, I think, is that Congress said, here's the process for figuring out how to transfer the assets from Conrail to the commuter authorities. Negotiate, reach an agreement if you can. If not, there's a series of mandatory steps. Once that process was initiated by SEPTA, the rest of the process was required by statute, and whatever was specified in the transfer agreement was required to be closed by the end of the year and conveyed to SEPTA so that SEPTA could continue the operations that Conrail had been performing. That's in Section 506, which is entitled Property Transfer. Subsection A gives the choice to each commuter authority to notify Amtrak commuter and Conrail whether it intends to operate. And so then B1 is the computer authority may initiate negotiations with Conrail for the transfer. And then it goes on later in 506 to say, well, if no one comes forward, then Amtrak commuter is to run this. An Amtrak commuter is an entity created in the 1981 Act and is separate and apart from Conrail. That's correct, Your Honor. Why doesn't that what I'm trying to have you focus and I don't know whether Judge Subelman will agree, but the point is that whole section in the 1981 Act is here's how the property is going to be transferred. And Conrail has failed. So what was up to the local commuter or what Congress called each commuter authority? That's right, Your Honor. That is how we read the statute. And because this is Congress's scheme for transferring the assets of Conrail to the appropriate commuter authority, that overrides any statute, any private contract. But your key languages may initiate negotiations, right? Yes. I don't understand why I may initiate negotiations. Gives you a legal right to get to that. That's your pleasure. It's a statutory option that once exercised, then the negotiations start, the parties reach an agreement, and then the property is to be conveyed. That was the process that Congress... But where's the agreement? There was an agreement. I don't have the record site, Your Honor, but there was a transfer agreement that was executed by SEPTA and Conrail on September 1, 1982 as provided by the Act. It specified, among other properties, the transfer of the commuter easement. We fully complied, and then on December 31, 1982, SEPTA and Conrail closed on that transaction, and the commuter easement was conveyed to SEPTA. We completely complied with the Act and followed the process that Congress laid out for effecting the transfer of Conrail. I see. One more point. Your point is Amtrak's option was eliminated by virtue of this statute. Yes, sir. That's your basic theory of the case. Yes, that's correct, Your Honor. Mr. Fusk, I thought you were also relying on the final plan under the 1875 Act as well as creating a right in SEPTA and then also an option to acquire or to lease these properties. I mean, did NRSA override the final plan or supersede the final plan in some way? No. In that instance, it supplemented it. It did not take away the right in the supplemental appendix. I don't have the page sign off the top of my head. There's a letter after the Northeast Act from the U.S. Railway Association reaffirming that the Section D rights did not go away. Further, I would point out that, as I think Judge Rogers pointed out, when you go through the Northeast Act scheme, at the end of the day, even if Amtrak commuter had received Conrail's assets, the commuter authority could still at that point have required the transfer of those assets to the commuter authority if it then chose to operate its own service, which mimics the Section D rights. So it provides a second independent avenue. I admit I'm somewhat skeptical that NRSA itself gives you this right because it talks about initiating negotiations, which doesn't seem like as firm of a right as from the 1975 Act and Section D of the plan. So I'm wondering, are you relying on both? We are relying on both. As I said, I believe first that the Northeast Act itself, by setting in place a process that is initiated by the commuter authority, by SEPTA, for the parties to work out how they're going to do the transfer, but the transfer itself is required. That is sufficient under Connelly and the other cases to prevent Amtrak from exercising its option. What is the textual reliance language in the final system plan? What is the specific language on which you rely? It is... I apologize, Your Honor. Section D, and this is at... I apologize. I don't have the... Section D says the following rail properties of a road named railroads. Is that the one? Yes. Well, what's the key language in it? It says, may be purchased or lease. May be purchased or lease. Now, why the devil does that give you a legal right? Because we exercise the right to purchase it. At what price? I don't know that there was a specific price for the... Then, why do you have a claim that it's free? Because the entire Northeast Corridor, including the commuter easement, was divided up by Congress through the final system plan among the various rail modes or freight, intercity, and commuter rail. And there was... no one was paying anything for any of this. Well, it went from may be purchased or lease. That implies a negotiation and an arrival of a figure. That doesn't give you a legal right to get it free. But we did negotiate in the transfer agreement for the transfer of that asset, among the other assets, and that was satisfactory to Conrail. I think that's more than sufficient. Well, you know what's a little puzzling about that? When did Conrail give the option to Amtrak? In 1973. When exactly? The easement was dated April... I forget the date. I want to say 3rd, 1976. And you know what? That's after the system plan is published. So, obviously, Conrail was not under the impression then that it was obliged to give this property to a commuter company like SEPTA. It was thinking that it gave Amtrak the option. Actually, when you go back to the 1976 statement, it's talking about when... Let's see. How does it say it? It says it's talking about the grantee and grantor. And Conrail is the grantor. The grantee is Amtrak. And it says blah, blah, blah. And I'm at JA 238 to 239. It says the grantor shall elect to abandon or assign computer passenger service easement in whole or part to a facility, blah, blah, blah. The grantee, Amtrak, shall have first option. Well, all of that notion about Conrail being in charge and electing what the 1981 plan indicates, not the plan, but the act, is that by 1981, Congress had determined that Conrail was a failure in the sense it wasn't carrying out what Congress had intended it would do. And so Congress changed the system. So this whole notion that Conrail had any election disappeared. Now in the 81 Act, Congress says, here's how we're going to do it, section 506. And it says either one of these local groups is going to say, we want to do this commuter passenger service and negotiate about it. And if they can't agree or whatever, then all of this is going to go to a new entity created by the 1981 Act, namely Amtrak commuter, which is distinct from the Amtrak before us in this case. Isn't that correct? Yes, Your Honor. So when the District Court focused on the language that Judge Silberman first questioned made, talking about well, all the 81 Act says is may negotiate, may enter into negotiations. Was this argument that I've been asking you about presented to the District Court? Yes, it was definitely presented, Your Honor. We relied heavily on the same line of argument that the Northeast Act effectively made unenforceable Amtrak's option precisely because the effect of the Northeast Act was to change the scheme and to shift the operations from Conrail to the commuter authorities or Amtrak commuter at the commuter authorities option. Let me just say, because the chronology is so critical here, I found it very confusing to name these statutes anything other than the Act of 1976, the Act of 1981, whatever it was so that we're clear. So when you're speaking of the Northeast Act, what are you referring to? The 1981 Act. Precisely. All right? So that's the new scheme Congress has come up with. And either one of these local groups is going to come forward and negotiate and have an agreement or it won't. And so Congress says if it doesn't, then all this property that we have otherwise reserved to either Conrail or Amtrak goes to this new entity, Amtrak commuter. Sorry. And I didn't understand why the district court didn't pick that up. I mean, the district court is as bright as anybody. And so I thought, well, maybe this wasn't argued to him. It was argued, and that's why it's an assignment of error on our part. We believe he simply missed that. And as we said in our brief, he gave very short discussion of Connolly and that line of cases and really did not give full effect, we believe, to what the 1981 Act required and provided. Counsel, will you do me a favor? I couldn't hear exactly my colleague's question. Will you specify what you're talking about? She was asking whether we had, SEPTA, had presented this argument. Which argument? The statutory argument that the 1981 Act prevented Amtrak from exercising its option. Whether we made that argument below. Oh, you, that's the core of your case. Yes, sir. That the 506 overrode the option. Yes, Your Honor. Anticipated it. Zipped it out of the world. Yes, Your Honor. That is the argument that we did make it below. Yes, and I have difficulty seeing the language giving you that. And all I'll say, Your Honor, is that the 1981 Act gave the option to SEPTA to initiate a process pursuant to which the assets of Conrail would be transferred to SEPTA so that SEPTA could continue the operations of Conrail that Congress was terminating. That process itself... There's no question you're right that Congress gave Conrail the right to initiate its agreements. No, the statutory language is that with all due respect, the 506 is that the initiative is placed in these local authorities. Not in Conrail. No question that I agree. All right. That... That's the statutory language in front of me. And then our point, Your Honor... 506, yes. May initiate negotiations. It's the computer authority. And once those negotiations are initiated, then that is the process by which Congress designated to effect the transfer of assets from Conrail to SEPTA. And our point is that is the process that Congress put in place. A private contract option can't prevent it from being carried out. And that's clear from section A,  commuter authority shall notify Amtrak's commuter and Conrail whether it intends to operate. So the initiative lies with the commuter authority, and Congress contemplated, well, if none of them came forward, or they didn't, then the property was going to go to Amtrak commuter. I want to be clear. What was your response to Judge Rao's question about the final system plan? I wasn't clear about your response. We are relying on both the statutory argument under the 1981 Act and the rights conferred in section D of the final system plan. They're independent and complementary because the 1981 Act effectively reproduces that right because at the end of the day, even if everything had gone, all the assets had gone to Amtrak commuter, SEPTA could still have requested or required those assets to be transferred back to SEPTA or over to SEPTA. The implications, if I understand you correctly, of the final systems plan is that the subsequent action on the part of Conrail giving an option to Amtrak was illegal. I don't believe it was illegal at the time. No, you said it's inconsistent with the final system plan, and it came after the final system plan by some months. Your Honor, what I meant to say was that section D of the final system plan gave SEPTA an independent right to get rail assets, including the commuter easement and rights in the stations. How do you explain Conrail's subsequent giving an option to Amtrak in the face after implementing the final system plan? My point is that they could give the option, but that option can't be of its rights under either the final system plan or the 1981 Act. Well, an option, an option that isn't effective is not an option at all. Not with respect, not when Congress through the final system plan and through the 1981 Act has said that these assets need to go to SEPTA. There may have been other transactions. How can you explain what Conrail does then? Conrail way after the final system plan gives an option to Amtrak. If you're right, they're acting illegally because under your theory of the section D, that they were required to give this to SEPTA. Only if SEPTA asked for it, and the option itself could have been applied. There could have been circumstances when another entity could have tried to require the option. That's not the way the option is phrased. Well, the option is back in 1976. The plan comes along in 1975. And in section D, which is at JA 194, it talks about the following rail properties, blah, blah, blah, designated to be transferred to Conrail in section A of this appendix may be purchased or leased from Conrail by a state or local. Well, that whole system is out of the window, as it were, given that Congress comes along in 81 and says, we have to make changes in light of what's happened to Conrail. It's not working as we intended. Here's what we want to do. That's section 506. So, unless this plan is somehow embodied in the 1981 Act, which I don't see it in either section 506 A or B, I'm not clear why SEPTA is relying on it at this point, or why it has any legal effect at this point after Congress has said in the 81 Act it's the choice of the local authority. If they come forward and initiate negotiations with Conrail and they can reach agreement, fine. If they can't or none comes forward, then this property on the local commuters goes to this new entity that we have created, Amtrak commuter. I understand your argument, Council for SEPTA, when you say this section D of this 1975 plan, which was developed under a different statutory scheme, has resonance after the 1981 Act. It may, but I need it explained to me. I think our position is simply that under either section D or the 1981 Act, there is a mechanism for SEPTA to obtain the commuter easement. There's nothing inconsistent about the two, it's a question of which set of rights are used. What Judge Silverman's questions are getting to as I understand them, in part, is that if there was a 75 agreement, or not, what is it, not 75, July 26, 1975 final system plan, then until the 1981 Act is passed, Amtrak has both Conrail and Amtrak have some rights that were in the scheme. That's what I'm not clear when you say they're complementary. Even under the 1981 Act, under 506 subsection E, even if everything had gone to Amtrak commuter, SEPTA still had a right to obtain or could still have the ability to obtain those assets from Amtrak commuter for itself. That's down the road. The first step is in A, that each commuter authority shall notify Amtrak commuter and Conrail whether it intends to operate. Then that commuter authority may initiate negotiations with Conrail for the transfer, and any agreement that they reach has to include the service responsibilities, the rail property, and a transfer date that's not later than January 1, 1983. I mean, what went on before under a different statutory scheme it seems to me, unless Congress somehow indicated all this remained relevant, but it didn't because the factual circumstances have changed. Congress originally thought Conrail was going to be the solution, and it proved not to be according to Congress. And our argument is simply that everything you've said I agree with about the 1981 Act. The Section D, however, is not in any way consistent with that because it gives SEPTA the right to obtain the same assets from Conrail. No, but then it seems to me Judge Silliman's question, well, I don't know what the word is, have more resonance because you're dealing under a previous statutory scheme. And so abstract rights under that system agreement may have been different than they were after Congress passes the 1981 Act. And I thought that was the point that you were trying to make in the District Court. And the point that we're making with respect to Section D is that the things that were changed in the 1981 Act, the thing that it changed about the final system plan had to do with Conrail and its operating authority and its property rights by requiring them to be transferred to entities like SEPTA. And that's exactly what Section D already provided. So we don't believe that was affected by the 1981 Act. Exactly. That's my point, counsel. That was talking about an election that Conrail makes, etc. And that's all out of the window now. It's not Conrail's election to make. Congress says it's these local authorities to make because we've decided that's the way it should go. And if that doesn't work out, then we've created this new entity called Amtrak Commuter, and they're going to handle these properties. So they're going to handle the rights? I don't understand. I mean, I'm not sure I'm exactly following, Your Honor. I think under the 1981 Act, SEPTA had the ability to initiate the negotiations and then complete the transfer of assets that were contained in the transfer agreement. And that's what happened here. The Section D also provides a mechanism for SEPTA to acquire the same kinds of property rights from Conrail for itself. And that is also what happened here. So our only point is that there's two statutorily approved mechanisms for SEPTA to get the same property from Amtrak and nothing about Amtrak's contract option could stop SEPTA from exercising its statutory rights. It's the other way around, actually, sequentially. First, you have the Final Assistance Plan. Secondly, you have Conrail negotiating with Amtrak and giving them an option. No question about that. You don't dispute that option was given to Amtrak. But your argument is when Conrail did that, that was inconsistent with obligations Conrail had to sell to SEPTA or in the Final Plan, which is sort of strange because you have Conrail thinking obviously the Final Assistance Plan didn't preclude them from giving the option to Amtrak. Then you have the separate argument of the 1981-506 coming along abrogating, in your theory, the option given to Amtrak. Now, if Congress was abrogating that option, wouldn't it have to be pretty specific? As I read that language, it's certainly not specific on that proposition. I don't think it has to be specific at all, Your Honor. It can mandate a process. This is what we want to happen in order to achieve the public goal of assuring continued rail access along the northeast border and continued viable commuter service. That was the legislative objective, which is clearly within Congress's power. I don't think there's any... Oh, I don't doubt that Congress could have abrogated the option. It seems to me that you'd have to make it clear and the language I see in 506 doesn't get you there at all. Our point is not necessarily abrogation in an explicit sense, but a matter of inconsistency. The Congress set up a process that required the transfer of the asset included in the transfer agreement of the commuter easement to SEPTA. SEPTA and Conrail complied with the statute. Amtrak cannot assert a private contract right to prevent the execution of a statutory scheme. That's our fundamental point. Your neck gets back to my point. It says may initiate negotiations. And we did. But that doesn't give you a right. It depends on what the negotiations come up with. And the negotiations did come up with a transfer of the commuter easement and did include it in the transfer agreement that was executed by September 1, 1982. It did specify a closing date by December 31, 1982. And it was closed. The commuter easement was conveyed to SEPTA on December 31, 1981. And SEPTA has used it ever since. Exactly. Well, there's nothing inconsistent about may initiate negotiations but runs afoul of Amtrak's option. And my point is that once the negotiations were initiated as they were, Amtrak could not assert a contract right to prevent the completion of the statutorily mandated and described negotiation and transfer process. Why don't we hear Judge Rao, please continue. Just to follow up on Judge Silverman's point, say I don't think that the 1981 Act gives you any right that supersedes Amtrak's right of first refusal. What is your best argument that the final plan option that you have, the right to acquire or to lease these properties supersedes Amtrak's easement rights? Because in the final system plan, which was approved by Congress, Section D gave SEPTA the right to obtain... But as Judge Silverman points out, the easement comes after the final plan. So as to those two things, how do we choose which takes precedence? Your option or Amtrak's option? I mean, to me, that's really more of this case. And our option, because it's under Section D, which is part of the final system plan, was authorized directly to be created by Congress and approved by Congress after it was ratified by Congress. Conrail and Amtrak can agree to an option of any scope. And of course, there's any number of other entities that maybe Conrail could have tried to convey to. But that contract could not bargain away a previously granted right of SEPTA to obtain those assets. That's all it is. Does SEPTA have a right? Does SEPTA have a right to lease? Yes. Does SEPTA have a right to purchase? Yes. It's up to them. Yes. Conrail has nothing to say. That's correct. Why? How do you get that out of it? Because may it be purchased or leased from Conrail? That depends on what the negotiations ensue. And indeed, there's a process, is there not, for if there was disagreement, there is a process to decide that with a government agency, right? Yes. The 1981 Act provides very limited... No, I'm talking about 75. Yes, there's a process for resolving those disputes. And how is that to be done? Is it the secretary of... Was it one of the boards or one of the secretaries... I think these disputes went to the special court. No, I think it went to the secretary, didn't it? But I'm not sure. I'd have to follow up. Let's hear from Amtrak and then we'll give you some time on rebuttal. Thank you, Your Honor. Counsel for Amtrak? Thank you, Your Honor. Thank you, Your Honor. And may it please the court, Sean Murata on behalf of the National Railroad Passenger Corporation, better known as Amtrak. Let me get to your question, Judge Rao, about the final system plan. SEPTA treats the final system plan as if it says that SEPTA has a right to purchase or lease appropriate trackage rights to conduct commuter operations. But that isn't the same thing as the commuter easement. And it can't be for the reason that Judge Silberman pointed out, which is that the commuter easement postdates the final system plan. So it could not mean when the final system plan says appropriate trackage rights, it's referring to a commuter easement that does not exist yet. Moreover, the fact that the final system plan says purchase or lease means that you could structure those appropriate trackage rights in any number of different ways. You could do it through an easement as Conrail and Amtrak agreed to, but you could do it through an operating agreement, you could do it through a lease, and I think that's a key point in this case. SEPTA treats it as if we will not achieve the goals of the 1981 Act or the Reorganization Act, which includes the final system plan, if SEPTA doesn't get this easement. That's simply not true. From day one... Its position is not that the 81 Act specifically says SEPTA gets it, but rather that choice is left to the commuter authorities. And SEPTA is one. And it came forward. So what I don't understand, and let me ask you to clarify for me. What I've been focusing on is you don't disagree, do you, that Conrail did not work out as Congress anticipated it would to run an effective and efficient and financially stable rail system. I agree Conrail didn't work out the way Congress intended it to. So then Congress decided we need to redo this system that we had in mind. And it passes the 1981 Act. And what Congress did in the 1981 Act is it set up a system. SEPTA absolutely has the right to say, Conrail, we want to negotiate with you to figure out how to transfer properties to conduct commuter rail operations. And I think maybe you can even read into that a notion of good faith, that Conrail then has to enter into good faith negotiations to effectuate that goal. But what Conrail can't do through those negotiations is sell something it doesn't own, which is a commuter easement free of Amtrak's right of first refusal. Under SEPTA's view, as far as I can tell, that if SEPTA and Conrail had agreed to transfer the Brooklyn Bridge to SEPTA, then their position would be, well, the Northeast Act requires it and no private contract right could get in the way of that. But of course that's not the way. Go back to the 1976 language, and I want to be clear that that is the option Amtrak is relying on. Is that correct or not? So the option that Amtrak is relying on was the one that was conveyed through the deed that conveyed the Northeast Corridor properties. And is that the language that is repeated on JA 238 to 239? That's correct, Judge Rogers. All right. So it says provided that in the event the grantor, namely Conrail, shall elect to abandon or assign the commuter passenger service easement in Holeran Park other than to a subsidiary affiliate or successor entity, the grantee, namely Amtrak, shall have a first option to acquire such easement or portions thereof at the purchase price of $1. Is that the language of the easement on which Amtrak is relying on? Yes, Judge Rogers, it is. Well, the 1981 Act eliminates any option or election excuse me, eliminates any election in Conrail. Conrail has no right of election anymore because Congress has decided Amtrak has not done what we wanted it to do and so we're creating a new system and instead it gives these local authorities the choice. Do they want to do this or not? And if they do, they ought to let Conrail know and enter negotiations. And if they can agree, fine. If they can't agree, then Congress says a property that's at issue will go to Amtrak commuter, which is an entity created in the 1981 Act. So given that scheme when the the option you're talking about was based on Conrail having an election, that whole notion of Conrail's authority has gone. Or do you disagree? I think that's where we part ways, Judge Rogers, because Conrail And what is the basis of your disagreement? Your basis of the disagreement is that when Amtrak as I understand it had an option where Conrail elected and Conrail had the authority to elect, nevertheless any right that SEPTA may have obtained remains subject to Amtrak's right with this first option under a different scheme. So Judge Rogers, there was an election because Conrail was entered into negotiations. As part of those negotiations, Conrail had to negotiate as to what it would transfer. When was that election? The election was in the transfer agreement. It was in the 1982 September 1 transfer agreement. All transfer agreements were pursuant to the 1981 Act. That's what I'm trying to... Amtrak isn't mentioned in this regard in the 1981 Act. That's what I'm trying to understand. Right. So the 1981 Act says there has to be a transfer agreement. It doesn't demand what the transfer agreement, what properties will pass. That is the result of negotiations between Conrail and SEPTA. So at the moment that Conrail decided to put into the transfer agreement, and this is Joint Appendix page 319, which is the section that deals with the commuter easement, at the moment that Conrail elected to transfer that, that triggered the right of first refusal, which then Amtrak exercised. It's an election. Now Judge Rogers... What I'm trying to understand is if I have an option to buy your house under the property laws of 1976 and then those laws change that says such an option is off the table. Is your point that Congress would have had to have said that expressly in the 1981 Act in order to eliminate Amtrak's option under an election system in the 1976 Act? Well, Congress would have had to do in the 1981 Act is to make clear that it was a mandatory transfer of the commuter easement. Congress does not require the commuter easement to pass. Now, Judge Rogers, you mentioned the pass-through to Amtrak commuter, which is I'll note, it's a separate corporation but it's a fully owned subsidiary of Amtrak with all of that entails, including Amtrak's right through its board of directors to control its operations. Council, that's why I asked you what option you were relying on because I didn't understand, and maybe I missed this, Amtrak to be arguing to this court that Amtrak should be treated as Amtrak commuter. We're not arguing that, Judge Rogers, but what I'm saying is that one of the arguments that SEPTA has made, and I think your questions touch on this, is, well, don't you agree that Amtrak commuter would, a transfer to Amtrak commuter would not trigger the right of first refusal? And we agree with that. A transfer to Amtrak commuter, which we agree is a successor to Conrail as the commuter operator of last resort, and moreover, as a compelled transfer under subsection C of the section 506, that would not trigger the right of first refusal. So the follow-on question is, well, why can't they just get it from Amtrak commuter? And the answer is actually found at Joint Appendix page 341, where back in 1982, the parties did discuss possibly having the commuter easement passed through Amtrak commuter. And what the letter at JA341 says from Amtrak is, Amtrak commuter doesn't want the easement. Why? Well, because Amtrak, and I'm speaking outside the letter now, I want to be clear. This is my inference from the letter, is, why don't they want the easement? Well, because they're a subsidiary of Amtrak, and so they don't want to do things contrary to Amtrak's preference, which is to have this easement eliminated, which Amtrak has always disliked as a cloud on its title. What Amtrak would prefer, it preferred back in 1982, and it prefers today, is that there simply be a negotiated agreement for appropriate traffic rights, which is either an agreement between Amtrak and SEPTA, or set by the Surface Transportation Board, according to its powers in the statute. And that's a key point of this case. No SEPTA commuter will be left on a platform if you rule for Amtrak in this case. Rather, it's just a question of how much is SEPTA going to pay for these access rights. So my question is, say I agree with your position that the 1981  SEPTA any rights. So in 1975, however, there's both a statute and a final plan that's pursuant to the statute that gives SEPTA various rights. How does the easement and the right of first refusal override those statutory and final plan rights? Because what the statute gives is not a right to an easement. An easement is a particular way of structuring a transaction, which places a cloud on Amtrak's fee simple title to the Northeast border. So in fact, if you look at the back of the statute, it says SEPTA, Contrail, and Amtrak and SEPTA. Amtrak explains the drafting history of the easement and of the right of first refusal that's contained. That's a very interesting notion that the court should defer to an interested party's interpretation of the legislative history. I mean, you know, some questions should we even defer to and it's not my argument, Judge Rogers, but rather Judge Rao's question was getting at well, the final system plan gives certain rights. Why aren't those rights the commuter easement? And the point I was making was that you can structure the rights that the commuter easement gives in various ways. And so to say they have rights under the final system plan is not to say they have a right to an easement. They have a right to either a lease or to purchase appropriate rights, but it doesn't have to be through an easement. Our position is, and it continues to be, we are happy to negotiate a station lease with SEPTA that contains appropriate rights in the final system plan. And if we can't do that, we're happy to have the Surface Transportation Board set the terms and conditions and price of those rights for us. But it's not an easement. Oh, sorry, Judge Rao, go ahead. Thank you. The final plan may not give them the right to that particular easement, but doesn't it give them a right to acquire various rights that are also included in the easement? So to the extent that the final plan right and the easement are inconsistent, wouldn't the final plan and statutory right of SEPTA trump whatever terms are in the easement? So we agree that the final plan right, because the easement was meant to carry out the final plan rights of Conrail, which are essentially identical to those of SEPTA. Our point is we don't want this to be an easement, because it clouds title, it encumbers our development rights in various ways. Rather, SEPTA has a right to obtain the things that the final system plan gives it. It's not through an easement, it's rather through negotiation of a lease. Well, but Conrail had the easement, right? So the easement is one of the bundle of rights that Conrail had, and SEPTA has some statutory right to acquire the rights that Conrail had, and one of those property rights was an easement. So I'm not sure why the right of first refusal would trump SEPTA's statutory right. Well, we talked about the 1981 Act, and I think we are in agreement as to why that would not work. Setting that aside for a moment, the final system plan does not give the right to acquire Conrail's easement. That's the key point. Why not? Because the easement ... ... ... ... ... ... ... ... ... ... ... ... ... ... The easement doesn't exist at the moment that those words are put into law. Rather, the following properties are appropriate trackage rights, and the appropriate trackage rights can be embodied in an easement but are not the easement. It can also be through a lease. It could also be through an operating agreement. It doesn't have to be an easement, and I think that's actually the, that's the fighting point between us and SEPTA in this case, which is that SEPTA thinks it's entitled to an easement. We think SEPTA is entitled to what the final system plan says, appropriate trackage rights and access to stations, but through an agreement or through a agreement imposed by the Surface Transportation Board. So we are not trying to deny the rights that are contained in Joint Appendix page 148. Rather, we're just saying that you're not entitled to it in this specific form. I understand that might be pedantic, but it matters quite a bit to these two companies. In other words, my view is Section D did not include the computer easement for two reasons. Number one, it wasn't in existence at the time. And two, it wouldn't be terminology following rail property. That's right. In other words, since it didn't exist, it can't be part of the following rail property. That's exactly right. Is that your basic argument? That's absolutely right, Joseph. So what if Conrail, after the final plan, were, say, to acquire additional tracks? Would those not be part of the final system plan? So, you know, appropriate trackage rights. You say they have trackage rights. What if, you know, they acquired new tracks after the final plan? Would SEPTA not have an option to purchase those or to negotiate over those? I'm not sure why the easement is so different, right? Because they have a right to appropriate trackage rights. Conrail subsequently acquires different trackage rights or some bundle of rights under the easement. It's not clear to me why the final plan wouldn't apply to those. Yeah. I want you to answer her first question. What about subsequently acquired trackage? I think in those circumstances, because in those I want to be careful because what's unusual is that although there are only one track, of course, the final system plan and the various deeds bifurcate the uses between intercity passenger, freight, and commuter. What's sort of artificial is that Conrail has all the trackage rights in commuter operations. So the hypothetical still applies if they acquire more commuter tracks, you know, whatever. You're not answering the question. I know. I just want to be careful because I don't want to, these are very complicated statutes and I don't want to say something in response to the hypothetical that would be inconsistent with something that exists somewhere else in the world. I think they might have a right to operate on those tracks, but again, not by way of an easement. No, no, no. I think what my colleague is probing is your response to my question, which was, your theory is, I thought this was a one-week point on your paper. Your theory is that Section D only refers to existing trackage rights, not the computer easement for two reasons. It doesn't refer to a computer easement. I'm not sure why if the commuter easement were in pre-existence at the time of Title III, it wouldn't cover it. But let's assume, let's keep in mind it comes in afterwards. Then Judge Val asked, well, suppose there was new trackage that didn't exist at the time of the final plan. Wouldn't that new trackage be covered? Oh, I think the question has now clicked for me, and I think the answer is found at Joint Appendix 148. It's appropriate trackage rights for the operation of commuter services on all rail lines used by Amtrak, on which there are present operations of commuter trains. So I think the fact that it's present operations of commuter trains would suggest that perhaps later required track would not fall under the final system plan. Because it not only is talking, there's not only the temporal issue of what rights exist at the time of the final system plan, but the final system plan itself refers to the present operations of commuter trains as of the moment of the final system plan. So I think the final system plan itself also gives an indication that it's the rights that are in existence as of that moment. It doesn't use the term rights. It uses the term properties. Rail properties, and I believe rail properties is defined in the 76 Act as both property and rights to property. I see. Oh, well, I see your point. Well, I mean, it doesn't just limit it to the present operations on which there are present operations of commuter trains by transportation authority or which are useful for operation of trains by transportation authority. So, I mean, I think that, I don't think it's limited temporally necessarily. Or am I reading that incorrectly? So there is a discussion of used or useful, which I guess might suggest that if it's sitting in a warehouse somewhere but is nonetheless found to be I think even then we're winding back to the notion that there's not a right to acquire it, there's a right to purchase or lease it. SEPTA thinks that it's at SEPTA's election, but that's a statement found nowhere in the final system plan. Well, so then is your position saying the easement predated the final system plan? Then would SEPTA have a right to acquire the easement particularly? Because you're suggesting that easement, you have two arguments I guess as I see it, right? One is that the easement comes after the plan and therefore is not covered by it. And also that the easement is not the same as trackage rights. So what if the easement came before the plan? Or if it pre-existed the plan? The easement pre-existed the plan and I want to answer the question directly and then explain why I'm not sure the premise works. But I want to answer the question directly. The easement comes before it and I suppose you could say there's a right to purchase or lease it, but that still doesn't mean it's at SEPTA's election as opposed to anyone else's. So I think then we would be back to the same argument we had under the 1981 Act that says the choice between purchase or lease is at Conrail's election. And because it's at Conrail's election, it triggers the right of first refusal. Now let me answer why I'm not sure the premise works, which is that the commuter easement, even though it's drafted as an easement, was meant to carry out the final system plan and so therefore comes into existence as part and parcel of the Act and of the final system plan. So it's always going to postdate the final system plan. I'm just not sure the hypothetical exists. And that's one of the key points, which is although it's written as an easement, really what Amtrak and Conrail were trying to say at the time is, all right, you have certain rights in the final system plan. Here is how we have decided to embody that right, but we're only willing to do it with respect to Conrail. And so if Conrail tries to give it to someone else who's not a subsidiary, successor, or affiliate, we, Amtrak, want that back and then we're going to engage in purchase or leasing on our own terms with that new entity who's claiming traffic rights under the final system. I understand that's what Amtrak wants. You've said a few times. But it's not clear that that's consistent with the underlying final system plan. I mean, that may be what Amtrak hoped to do. But it's still not clear to me why that easement would undermine the rights that are in the final system plan that SEPTA. I'm not sure that the easement undermines the final system plan rights. I don't think that the final system plan gives SEPTA the unvarnished right that it thinks it has. Because to overcome the word elect in the option, it has to be compelled. And what SEPTA can't do is say, what is this easement as opposed to anything else? Because they equate their statutory right of access to the Northeast Corridor properties with access to this easement. And I don't think they can point to anything. And in fact, at page 41 of their brief, they say, well, you shouldn't read an implication from a lack of expressiveness into these statutes. But our position is unless they can point to something in the final system plan, the 1981 Act, that requires the transfer of this easement as opposed to merely appropriate trackage rights, then they can't overcome the word elect. Is it clear the term appropriate trackage rights is different from the easement? The easement includes appropriate trackage rights. The easement is not itself the appropriate trackage rights. Where do you get that? Because the easement itself says... And where do you get that out of the documents? I thought that was a point on your brief. It was a little weak. Well, I get it from the easement itself, which says that the purpose of this easement is to carry out the purposes of the 1976 Act. So, and this, I think, gets back to what I told Judge Rao, which is that the easement is one way in which you can embody the appropriate trackage rights, but it is not the appropriate trackage rights. And I don't think SEPTA can point to anything that says otherwise. There's nothing in the final system plan that says... No, no. My question is, what do you point to to exclude commuter easement from the term appropriate trackage? Because appropriate... It's appropriate trackage rights for the operation of commuter services on all rail lines used by Amtrak, and then there's a bunch of language that follows it. Nothing in that requires easement. Nothing. I guess your thought is that an Amtrak selection, whether they give an easement or some other... embody it in some other legal way. Through a process of negotiation, absolutely. And I think throughout all of these statutes, the 76 Act, the 1981 Act, Congress used the language of negotiations. Because although Congress was trying to reorganize passenger rail in America, they were attempting to do it through a group of at least nominally private for-profit corporations. Now, of course, all of these corporations were in many ways relying on the government for their operations, but Congress wanted this to be done through systems of negotiation and planning and working it out among the parties. So it did not say, you must give them an easement. It said, you must give them appropriate trackage rights and then have silence following. And into the silence comes negotiation. So your view is that nothing precludes Amtrak from embodying trackage rights to Conrail in an easement, but then when SEPTA comes along... It doesn't have to do it the same way. Doing it a different way. Right. And that's Amtrak's choice. That's right. And that's why it wrote in the option into Conrail's easement, which what in effect it does is it says, all right, Conrail, you get an easement, but you can't give this easement to someone else except a successor, an affiliate, or a subsidiary. That entity has to come along and work with us separately. How would that work practically, right? So if SEPTA has the right to acquire these trackage rights from Conrail and the way Conrail has these rights is through an easement, you know, what can Conrail give to SEPTA that's not the easement? I think it could... Right, because they have the right from Conrail, right, not from Amtrak itself. And what Conrail has is the easement. So what would SEPTA be able to get if it couldn't get the easement from Conrail? Well, but I think that if you get a lease, I think, over those rights, it could have a right to access perhaps through the easement. To the extent Conrail agreed to the option and it then merges in back to Amtrak, what then comes about is you have to purchase Amtrak. You have to what? I didn't hear the last part. You have to go back to Amtrak to get the appropriate trackage rights. So you're back to negotiating with Amtrak as your position? Yes. No matter what your position is, no matter what path you pursue, no matter what Congress says, you have to negotiate with Amtrak. No, Congress could say the easement must be transferred or you're entitled to trackage rights in an easement. But Congress didn't do that. So what you're left is with negotiating with Amtrak. And of course Amtrak can't be obstinate because there's always the Surface Transportation Board to break the agreement. Anything further? Does the whole case come down to the question whether trackage rights includes an easement? I'm not sure if the whole case comes down to that, Judge Silberman, but I think it's one of the elements of the case. No, but my point is if an easement is included within the term trackage rights, don't you lose? I think if you find that this easement is within the term trackage rights, then I have a much harder time. Unless the Court has further questions. Thank you. All right. Counsel Perceptive? Thank you, Your Honor. I want to pick up on that last point because I think it is key. The commuter easement are the trackage rights. They are the rights to use the track that Conrail created and reserved for itself when it conveyed the rest of the fee interest along with the freight easement, by the way, when they conveyed the fee interest to Amtrak. Those are the trackage rights. They are the appropriate trackage rights because that's what Amtrak and Conrail designated as the appropriate trackage rights. It makes no sense to say that we can't get the same rights that Conrail had. That was the point of the transfer. That was the point of Section D. When I say transfer, I mean the 1981 statute transfer. That was the point of Section D. At the time that Section D was written, there really weren't any trackage rights as such because that was before the division of property between the various railroad entities. It was by definition forward-looking and by definition gave the commuter authorities the right to obtain the appropriate trackage rights. I don't understand how you can say that the appropriate trackage rights aren't the very same embodiment of the easement rights. Surely there are other trackage rights besides the easement. There are. As Mr. Morata conceded, trackage rights could take the form of an easement, and they did. That is how the trackage rights were embodied. Why shouldn't Amtrak have the ability to decide that it will give over appropriate trackage rights in some way other than easement? This gets back to the 1981 Act. What we're talking about here is continuity of service under a revised scheme when Conrail left the picture. In the original final system plan in 1976, the idea was that Conrail will do it. There's all the rights that Conrail needed that were granted to it and that needed to do with service. In 1981, Congress said all that needs to switch over to either a local commuter authority or Amtrak commuter at the commuter authority's election. SEPTA elected, and it said, we want the same things that Conrail had, and Conrail gave those to them. Council, you agree, that last clause. Is that in the statute? I beg your pardon, Your Honor. I'm sorry. You said you want continuity so the local SEPTA can negotiate with Amtrak. That's all SEPTA, right? Yes. Well, no. Earlier in Section 1136, and certainly in the initial section, it says the goal of this is to terminate Conrail's commuter operations and transfer it to an appropriate commuter authority. The process that it set up to do that in 1137 is how it affected that. As we talked about before, through the process at SEPTA's initiation, the parties agreed to designate the commuter easement and other assets for transfer to SEPTA to allow SEPTA to continue the same operations, which is what Congress ultimately wanted, was to continue commuter operations under a different operator than Conrail. Did you speak in referring to 507? You meant 506? I don't see 507 in your statutory agenda. I'm sorry. I meant 1137. You meant 11... 1137 when I was talking about the transfer. Where is 1137? On page 76. So that's Section 506. Yes. I'm sorry. Let's refer to the same thing the same way for just help us understand what's going on here. My basic point is that the point of the 1981 Act was to affect the transfer of Conrail's commuter operations to local commuter authorities if they so elected. SEPTA did so elect. SEPTA and Conrail agreed to the properties to be conveyed, which included the commuter easement, which makes perfect sense because SEPTA was taking over the exact same operation as Conrail to affect the same purpose that Conrail was created to do, which is to provide commuter rail service. There's no reason why Amtrak and SEPTA need to start all over when this was just an assumption of interest. And I want to make another point because it relates back to the option terms itself. Mr. Maradas agreed that Amtrak commuter was considered Conrail's successor. And yet, the 1981 Act refers to Amtrak commuter and local operating authorities like SEPTA as equals. If Amtrak commuter is a successor, in this case, so must SEPTA be considered a successor because it succeeded to Conrail's operations in exactly the same way that Amtrak commuter would have. And as far as for the election point, I think the broader point here is that Conrail was being put out of business. Just one final question. Can you point to something in the statute or the final plan that precisely says that SEPTA with respect to acquiring these trackage rights sort of gets to step into the shoes of Conrail as opposed to negotiating with Amtrak separately? Well, it's that in section 506 in the property transfer. No, we're not talking about the 1981 Act. We're talking about the final plan. Oh, I'm sorry. Well, the final plan... Or in the statute that, you know... Well, it would be section D, which allows SEPTA to acquire the appropriate trackage rights and use the property interest in the stations to carry out the commuter operations. And I... In the final system plan, of course, in that case, we're contemplating the elimination of Conrail service and succeeding to that by the local commuter authority. So it's a different context, but I think the point is that... And I want to put a little bit of context on this. At all times, SEPTA was paying either Conrail... was paying at the time Conrail for the service. It wasn't being offered for free by Conrail. So when SEPTA takes it over, it's really just taking over operation of its own service as opposed to contracting out for it with either Conrail or as an option with Amtrak commuter. So it always was SEPTA's service. It was a question of who was actually operating it. In the 1981 Act, Congress gave the option to operate it not to Conrail, but to either SEPTA or, at SEPTA's election, Amtrak commuter. I think that's... Here's one more question I have to make sure I understand. Your position is the transaction between Conrail and Amtrak whereby Conrail gave Amtrak the... Excuse me. Conrail maintained an easement with Amtrak getting the option. Your position is that was illegal. My position is there's two positions. One, under the facts, their option was never triggered because Conrail did not make an election. I know. I'm not very impressed with that argument. And secondly, that the option was unenforceable as against SEPTA because SEPTA was acting pursuant to either Section D and or the 1981 Act. Well, it would have been unenforceable against any computer company, right? Well, in this case... So basically, it's an illegal opt... I could imagine... I'm not really... Fundamentally, I don't disagree with that. I'm just saying there could have been a particular purchaser who, for whatever reason, it would not have been contrary to Congress' plan. I don't know what that would be. But yes, the option was unenforceable especially if SEPTA wanted to acquire it, the easement. Conrail plays an interesting role in this whole process. They seem to be on all sides of everything. Well, Congress put them in the middle, and then Congress took them out and left it. And then it said, SEPTA, you take... Essentially, SEPTA, you take over from Conrail. And that's exactly at all we're really trying to do here, and to continue the service on the same terms. Thank you. All right. Thank you, counsel. We'll take the case under advisement.
judges: Rogers, Rao, Silberman